SUN BANKS OF FLORIDA, INC., a
Florida Corporation Etc.,
Plaintiff-Appellee,

v.

SUN FEDERAL SAVINGS AND LOAN
ASSOCIATION, a Federal Savings and
Loan Association, Defendant-Appellant.

No. 78–3530.

United States Court of Appeals,
Fifth Circuit.

July 20, 1981.

Rehearing and Rehearing En Banc
Denied Sept. 14, 1981.

James Elliott Messer, Robert L. Hinkle, Tallahassee, Fla., for defendant-appellant.

W. Brown Morton, Jr., King George, Va., J. Thomas Cardwell, Orlando, Fla., J. Robert McClure, Jr., Tallahassee, Fla., Charles E. Harris, Orlando, Fla., for plaintiff-appellee.

Before HILL and POLITZ, Circuit Judges, and O'KELLEY *, District Judge.

POLITZ, Circuit Judge:

■ This is an action for service mark infringement alleging violation of the Lanham Trademark Act, 15 U.S.C. §§ 1051–1127,[1] and the common law tort of unfair competition.[2] After a bench trial, the district court found a likelihood of confusion between the service marks of Sun Banks of Florida, Inc. (Sun Banks) and Sun Federal Savings and Loan Association (Sun Federal). The court permanently enjoined Sun Federal "from using the name 'Sun' in con-junction with or without the orange sun logo in the advertising and promotion of banking services." We reverse.[3]

## I. Facts

Appellee Sun Banks, one of the largest multi-bank holding companies in Florida, began doing business in 1967 under the name First at Orlando Corporation. When several banks outside the Orlando area were acquired, the decision was made to adopt a less geographically-restrictive corporate name. On April 12, 1974, after an extensive marketing campaign, appellee officially changed its name to Sun Banks of Florida, Inc. On June 17, 1977, the United States Patent and Trademark Office issued U. S. Registration No. 1,013,709 to appellee. The service mark includes the words "Sun Banks" together with an orange colored arc. In addition to the federal service mark, Sun Banks has five service marks used in connection with its banking businesses that are registered with the State of Florida: "Sun Bank," "Sun Banks" with orange arc design, "SunBank24" (automated teller machine), "SunBanker24" (plastic banking card), and "Sun Banks Preferred

---

* District Judge of the Northern District of Georgia, sitting by designation.

1. The provision of the Lanham Act pertinent to this litigation, 15 U.S.C. § 1114(1), provides:
   Any person who shall, without the consent of the registrant—
   (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
   shall be liable in a civil action by the registrant for the remedies hereinafter provided.

2. Unfair competition occurs when one business entity "palms off" its products or services as those of another. *See, e. g., Boston Pro. Hockey Ass'n v. Dallas Cap & E. Mfg., Inc.,* 510 F.2d 1004 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *B. H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254 (5th Cir. 1971).
   The complaint alleged a third theory of recovery: dilution of Sun Banks' service mark in violation of Fla. Stat. § 495.151 (1977). On the basis that the likelihood of confusion between the two service marks in question went to the *source* of the services provided by the litigants, the district court rejected the claim of dilution, quoting from our language in *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 450 (5th Cir. 1973):
   Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark.
   Sun Banks makes no issue of this adverse finding.

3. Jurisdiction is predicated upon 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a), for actions arising under the trademark laws of the United States; 28 U.S.C. § 1338(b), creating pendent jurisdiction for the claim of unfair competition; and 28 U.S.C. § 1331, federal question.

Account" with orange arc design. At the time of trial, Sun Banks controlled 36 subsidiary banks with 60 offices throughout 16 counties in Florida.[4]

Appellant Sun Federal, a savings and loan association with its principal place of business in Tallahassee, Leon County, Florida, conducted business under the name Leon Federal Savings and Loan Association from 1952 until 1975. In 1975 appellant received Federal Home Loan Bank Board approval to open a branch in Venice, Sarasota County, Florida. In marked similarity to Sun Banks' motivation, this development prompted consideration of a less parochial name, and oñ November 1, 1975, the association changed its name to Sun Federal Savings and Loan Association. Sun Federal subsequently obtained Florida registration of the service mark "BRIGHT ORANGE SUN AND THE WORDS SUN FEDERAL SAVINGS AND LOAN ASSOCIATION." Sun Federal did not seek federal registration.

■ At the time of trial, Sun Banks did not own banking facilities in either Tallahassee or Venice. Both parties, however, clearly indicated their intentions to expand throughout Florida and, at the time of this writing, very probably are co-existing within one or more communities.[5]

## II. Likelihood of Confusion

■ The essential question is the "likelihood of confusion" concerning the identity or association between Sun Banks and Sun Federal due to their common use of the name and mark "SUN." 15 U.S.C. § 1114(1); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir. 1979), *cert. denied*, 444 U.S. 932, 1100 S.Ct. 277, 62 L.Ed.2d 190 (1979). In assessing whether there is a likelihood of confusion with re-

spect to service marks, we weigh several objective factors: type of service mark, similarity of design, similarity of service, identity of service facilities and customers, similarity of advertising media used, defendant's intent and actual confusion. *Roto-Rooter Corporation v. O'Neal*, 513 F.2d 44 (5th Cir. 1975). The district court concluded that there was a likelihood of confusion. The threshold consideration on appeal is the applicable standard of appellate review.

■ Sun Banks urges the aegis of our repeated statements that the likelihood of confusion is a factual finding reviewable under the clearly erroneous test of Rule 52(a), Fed.R.Civ.P. *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500 (5th Cir. 1980); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Sun Federal seeks a more hospitable landing zone and offers a distinction between "likelihood of confusion" as a question of fact in the appellate review crucible and factors of precedential magnitude which must be considered by a court in determining "whether confusion is likely." We find the offered distinction ingenious but unpersuasive. Our comment in *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 384 (5th Cir. 1977), that "when a district court labors under a misapprehension concerning the governing legal norms, the 'clearly erroneous' standard no longer cirmcumscribes appellate review," may not be taken as an erosion of the standard of review applicable to a finding of likelihood of confusion.

■ Sun Federal asserts two errors of law by the trial judge in assessing the burden of proof. Because of our disposition of the case they need not be fully addressed.

---

**4.** With the advent of Florida's branch banking law, Fla.Stat. § 659.06 [now § 658.26 (Supp. 1981)], which became effective January 1, 1977, Sun Banks merged a number of subsidiaries as it created branch banks. At the time this appeal was filed, Sun Banks had 21 subsidiary banks and 84 banking offices, and was the third largest bank holding company in Florida measured in terms of total deposits.

**5.** Pursuant to the "expansion area" doctrine, because Sun Banks has offered sufficient evidence of its intent to expand into other areas occupied by Sun Federal, the protection afforded by the Lanham Act runs to those areas as well. *See American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir. 1963).

We simply note that the presumption of validity that attaches to a service mark, 15 U.S.C. § 1057(b), is not relevant to the issue of infringement and that the burden of proof of infringement must be borne by the party claiming injury. *See American Foods, Inc. v. Golden Flake, Inc.* 312 F.2d 619 (5th Cir. 1963).

■ Notwithstanding the nuances that might be suggested, the commanding appellate question is whether the district court's finding of likelihood of confusion is clearly erroneous. We are convinced that it is. *See United States v. Gypsum Go.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) ("A [district court's] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."); *W. R. B. Corporation v. Geer*, 313 F.2d 750, 753 (5th Cir. 1963), *cert. denied*, 379 U.S. 841, 85 S.Ct. 78, 13 L.Ed.2d 47 (1964) ("the clearly erroneous concept of Fed.R.Civ.P. 52(a) requires findings to be set aside if the Court is left with the impression that the result is not the truth and right of the case"). In arriving at our conclusion, we apply seriatim the factors listed in *Roto-Rooter Corporation v. O'Neal, supra*.

### A. Type of Service Mark

■ A vital factor in the determination whether there is a likelihood of confusion between the two services marks at bar is the strength or weakness of Sun Banks' mark.[6] Service marks fall into four categories. A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive.[7] It is afforded the widest ambit of protection. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 259, *quoting* Lunsford, *Trademark Basics*, 59 Trademark Rep. 873, 878 (1969). A descriptive mark tells something about the product; it is protected only when secondary meaning is shown. *See Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111 (5th Cir. 1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Miss Universe, Inc. v. Patricelli* 408 F.2d 506 (2d Cir. 1969). *But see Hesmer Foods, Inc. v. Campbell Soup Company*, 346 F.2d 356 (7th Cir.), *cert. denied*, 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965) (barbecue beans used as a description, not as a trademark). In contrast to the above is the suggestive mark, which subtly connotes something about the service or product. Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning. *See Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980) ("If used as a trademark for refrigerators, the term 'Penguin' would be suggestive."). Lastly, there are generic terms, which communicate "information about the nature or class of an article or service," *America Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir. 1974), and therefore can never become a service or trademark.

■ We do not necessarily disagree with the trial judge that Sun Banks' mark should be categorized as "arbitrary." This label alone, however, does not precipitate absolute protection. Arbitrariness refers to the quality of a mark, *i. e.*, that it bears no relation to the service provided. The ultimate strength of a mark, the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace. As we observed in *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 260:

Thus, "Domino" is not a coined word, is not purely fanciful, and while its application to sugar may be arbitrary, it is still not to be accorded the same degree of

---

6. For an excellent recent discussion of the classifications accorded service and trademarks, see *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178 (5th Cir. 1980), and cases cited therein.

7. For example, the term "Kodak" bears no relationship to the product with which it is associated. *Soweco, supra*, note 5. *See also National Lead Company v. Wolfe*, 223 F.2d 195 (9th Cir.), *cert. denied*, 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955) ("Dutch Boy").

protection given such coined and fanciful terms as "Kodak" or "Xerox." *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 505 (5th Cir. 1979) (wide use of mark "World" results in little likelihood of confusion); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 448 (5th Cir. 1973) (common word "Holiday" is of weak trademark significance); *El Chico, Inc. v. El Chico Cafe,* 214 F.2d 721, 725 (5th Cir. 1954) (27 trademark registrations of "El Chico," along with the fact it was the name of a Moorish king of Granada in 1482, and is the name of a Mexican town and a river in the Philippines, make the term a weak trade name deserving limited protection).

In *Amstar* we reversed a finding of likelihood of confusion, in part because the district court failed properly to weigh the impact of extensive third-party uses of the "Domino" mark. In the case at bar we are confronted with an even more impressive array of third-party single and multi-word uses of the "Sun" mark. The evidence reflects that in 1976 over 4400 businesses registered with the Florida Secretary of State used the word "Sun" in their names. A significant number of these businesses fell within the category designated financial institutions.[8] In addition, the evidence included a sampling of other businesses across the country having federally registered trade and service marks using the word "Sun." The district court discounted this evidence, considering it irrelevant to the question of third-party users operating within the financial field, citing *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609 (7th Cir. 1965), and unsupported by data reflecting the type of business conducted.

█ We are not convinced the court in *Tisch Hotels* meant to convey that third-party use of a word can *never* be relevant to the issue of likelihood of confusion. Regardless, we decline to accept that proposition in this case. To the contrary, we find the extensive third-party use of the word

"Sun" impressive evidence that there would be *no* likelihood of confusion between Sun Banks and Sun Federal. *See, e. g., Amstar Corp. v. Domino's Pizza, Inc., supra* (72 third-party registrations of the mark "Domino"); *Armstrong Cork Co. v. World Carpets, Inc., supra* (multiple uses of the mark "World"); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra* (multiple uses of the mark "Heritage"); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445 (5th Cir. 1973) (multiple uses of the mark "Holiday"); *El Chico, Inc. v. El Chico Cafe,* 214 F.2d 721 (5th Cir. 1954) (27 third-party registrations of the mark "Chico," "El Chico" and other similar names).

█ Furthermore, we find that the mark "Sun Banks" comes within the general rubric reported in 3 Callmann, *Law of Trademarks* § 82.1(i), at 722:

> Whether an addition is sufficient to prevent confusion in a particular instance depends upon the strength of the main part of the mark and the distinctiveness of the additional feature. Where a trademark is itself weak, minor additions may effectively negate any confusing similarity. Thus, for example, the word or representation of the sun is so weak a trademark that the word "Sun-proof" was held to be sufficiently distinct from "Sunset" and "Sun Glo" . . . .

*See Patton Paint Co. v. Sunset Paint Co.,* 290 F. 323 (D.C.Cir.1923) ("Sun-Proof" versus "Sun Glo"); *Patton Paint Co. v. Sunset Paint Co.,* 290 F. 326 (D.C.Cir.1923) ("Sun-Proof" versus "Sunset"). In substance this same view was expressed by the Florida Supreme Court in *Sun Coast v. Shupe,* 52 So.2d 805, 805 (Fla.1951), in rejecting a request that the court enjoin use of the name "Sun Coast":

> Were we to uphold the appellant it would mean that it could combine two words of quite common meaning, "Sun" and "Coast" and, we are tempted to say, very descriptive of places and characteristics of this state, and by doing so preempt

---

8. A 1976 composite printout from the records of the Corporate Division of the Florida Secretary of State revealed 25 active financial businesses employing the word "Sun" and 50 active financial businesses employing a compound of the word "Sun."

the use of these two words together in, to repeat, "practically every type of commercial venture."

Representatives of both Sun Banks and Sun Federal attested that the word "Sun" was selected for their new names because it personified Florida and conveyed the universal appeal of warmth and friendliness. As stated by Sun Banks: "Sun was more than just a name. It was a symbol of our heritage and our future." And while Florida certainly cannot claim a monopoly on its association with the sun, it can justifiably claim, perhaps by acquisitive prescription, a somewhat special relationship.[9]

We agree with the district court that the name "Sun" is too broad to be geographically descriptive. *See World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971). However, this is merely further proof of the widespread use of the term which militates against a finding of likelihood of confusion.

Finally, we find the district court was unduly concerned that Sun Federal's evidence of third-party use was not supported by data reflecting the type of business of those users. The evidence abundantly established existing third-party use of the name "Sun," both within and without the financial community.[10]

### B. Similarity of Design

An examination of the Sun Banks and Sun Federal service marks discloses a similarity in appearance only with respect to the inclusion of the name "Sun" and the orange color of the logos. Sun Banks' logo:

Sun Federal's logo:

The district court placed considerable emphasis on the common word usage "because it tends to immediately suggest a connection between the two institutions." We fail to perceive an "immediate connection" in light of such common use of the word "Sun" by Florida businesses. *See* 3 Callmann, *Law of Trademarks* § 82.1(1), at 765–66 ("such marks as a star or the sun in word or picture are of such long standing in the business world and have been used in so many lines of business that neither can be considered the exclusive mark of one manufacturer or tradesman so as to deny its use by others").

■ It is well established that "[s]imilarity of appearance is determined on the

---

**9.** Our attention has been invited to the fact that Florida is not alone in its designation as the "Sunshine State." South Dakota joins in that appellation.

**10.** The unchallenged information in Sun Federal's brief denotes a further breakdown of those Florida businesses which are closest in function to that of Sun Banks. *E. g.*, (1) commercial banks: Sun City Center Bank, Suncoast City Bank of St. Petersburg, and Sunrise American National Bank of Ft. Lauderdale; (2) credit unions: Sun Federal Credit Union and Suncoast Federal Credit Union; (3) mortgage, acceptance, investment and life insurance companies: Sun Mortgage, Sun Acceptance Corporation, Sun Life Assurance Company of Canada, and others. We note that incorporations, mergers, acquisitions and name changes constantly transpire and upset a precise headcount of third-party financial users of the word "Sun." Nevertheless, the existence of such users has been sufficiently portrayed to satisfy our inquiry.

basis of the total effect of the designation, rather than on a comparison of individual features." Restatement of Torts § 729, Comment b (1938), *quoted with approval in Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 260–61. *See also Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d at 502 ("It is the overall impression that counts."). We consider significant the fact that neither party has ever used the name "Sun" alone in its advertising;[11] in every instance the word "Banks" or "Federal" was included and afforded like emphasis.

### C. Similarity of Service

Traditionally, a number of distinctions existed between the services offered by commercial banks and savings and loan associations. The Depository Institutions Deregulation and Monetary Control Act of 1980 substantially closed that gap, particularly by permitting savings and loan associations to act in areas previously reserved to commercial banks.[12] With this similarity of service comes the potential for the public's mistaken assumption of connexity between the providers of related services. The more likely the public is to make such an association, the less similarity in the marks is needed for a finding of likelihood of confusion. *See American Foundries v. Robertson*, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317 (1926); *Exxon Corp. v. Texas Motor Exchange of Houston, supra.* This current inherent degree of similarity between commercial banks and savings and loan associations is but one factor to be evaluated in assessing the likelihood of confusion. We do not find it to be the dispositive factor.

### D. Identity of Service Facilities and Customers

Consistent with the similarity of services provided by Sun Banks and Sun Federal, both businesses operate from substantially similar facilities and are capable of attracting similar customers. The identity of service facilities for the most part includes branch offices and subsidiary banks located in areas of high exposure such as shopping centers or large residential areas. The identity of customers, in turn, is largely the result of comparable services offered. Although we again find this factor to be of some weight, *see Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 262 ("Dissimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendants' goods lessen the possibility of confusion, mistake, or deception."), it is insufficient to overcome the result commanded by our other inquiries.

### E. Similarity of Advertising Media Used

During the four year period from 1973 to 1976, Sun Banks expended approximately $6.5 million on the development and promotion of its new name. Various advertising media were employed, including local, state and national newspapers and magazines, radio and television, pamphlets and circulars, posters, billboards and signs. Sun Federal's advertising, while limited primarily to Leon and Sarasota Counties, has been carried on through much of the same media. This factor has a bearing on likelihood of confusion, *see Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d at 506 ("The greater the similarity in the campaigns, the greater the likelihood of confusion."), but in this case is insufficient to sustain a finding of likelihood of confusion in light of the restricted range of protection to which Sun Banks' weak mark is entitled.

### F. Defendant's Intent

That a latecomer adopts another's name or mark, deliberately seeking to capi-

---

11. In a letter to the Trademark Section of the Florida Department of State, general counsel for Sun Banks made clear the scope of protection the bank hoped to obtain by registering its service mark:

> If necessary, we will file on behalf of the proposed registrant a representation that they do not wish to preempt use of the words "SUN" or "BANK" so long as the words do not appear in the form or design of the mark as presently utilized and as represented in the enclosed copies.

12. Some of the more significant changes affect the areas of checking accounts, consumer loan powers, trust powers, credit card operations, reserve requirements and elimination of the interest rate differential. For a broad analysis of many of the recent developments, see Wilson, *The "New Checks": Thrift Institution Check-Like Instruments and the Uniform Commercial Code*, 45 Mo.L.Rev. 199 (1980).

talize on the other's reputation and benefit from the confusion, is an important factor for any court. *Amstar Corp. v. Domino's Pizza, Inc., supra*; Restatement of Torts § 729, Comment f (1938). In the case at bar the district judge was obviously impressed by what he considered to be a damaging remark allegedly made by Sun Federal's president, Samuel Teague, to Frank Shaw, a member of the board of directors of Sun Federal's actual or intended competitor. Mr. Teague purportedly told Mr. Shaw that he hoped any similarity between Sun Banks and Sun Federal would redound to Sun Federal's benefit. On cross-examination Mr. Shaw equivocated, saying he did not know whether the statement was made in jest. Mr. Teague specifically denied making the statement, assigning both general and specific reasons why he would not have made such a statement to Mr. Shaw. We recognize that great deference is due a credibility call by a trial judge. Rule 52(a), Fed.R.Civ.P.; *Dillon v. M. S. Oriental Inventor*, 426 F.2d 977 (5th Cir.), *cert. denied*, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140 (1970). After several readings of the pertinent testimony, however, we remain unconvinced that the evidence supports the finding that the remark was made. In any event, whether we accept or reject this finding is not a controlling factor in our ultimate decision.

### G. Actual Confusion

█ Evidence that use of the Sun Banks and Sun Federal service marks has led to past confusion would be persuasive proof that future confusion is likely. *Roto-Rooter Corporation v. O'Neal, supra* (four persons mistakenly employed defendant although intending to use services of plaintiff). Although the record contains several isolated instances of uncertainty whether there was a connection between the two businesses, in light of the number of transactions conducted and the extent of the parties' advertising, the amount of past confusion is negligible.

The first indicia of confusion offered by Sun Banks came in response to a letter written by Sun Banks' president to all subsidiary banks requesting employees to report incidents of confusion stemming from Sun Federal's use of the word "Sun." In three years, less than fifteen such incidents were reported. Some of those involved relatives of Sun Banks' employees, while others could not be identified. Apparently none of the remarks was made by a potential customer considering whether to transact business with one or the other of the parties. Sun Banks also produced four witnesses who recounted having inquired whether Sun Banks and Sun Federal were related. Again in each instance there is no indication that the inquiry was made by a potential customer concerning the transaction of business.

Such evidence of confusion should be given appropriate consideration. In determining the likelihood of confusion, however, a court must consider all of the evidence, including countervailing circumstances which lessen the impact of asserted instances of confusion. *See First Southern Fed. Sav. v. First Southern Sav.*, 614 F.2d 71 (5th Cir. 1980) (no substantial likelihood of confusion even though *actual* confusion existed on several occasions). We find the countervailing circumstances in this case to lessen significantly the impact of any actual confusion which might have occurred.

### CONCLUSION

█ We conclude that the evidence compels the finding that there is no likelihood of confusion between the Sun Federal and Sun Banks service marks. When there is no likelihood of confusion, there can be no trademark infringement. 15 U.S.C. § 1114(1); *Amstar Corp. v. Domino's Pizza, Inc., supra*. This holding disposes of both the federal law claim and the state law claim of unfair competition asserted under pendent jurisdiction.

The judgment of the district court is REVERSED.

O'KELLEY, District Judge, dissenting:

I must respectfully dissent from the majority's opinion reversing the district court. I would affirm the district judge. To do

otherwise requires this court to review the evidence and find the facts differently than the trial court. The evidence supports the trial court's findings and conclusions. A reading of the majority opinion can lead but to one conclusion. That is that factually, not legally, this court finds that the appellant's name is not likely to be confused with the appellee's name and registered service mark. As a matter of law that conclusion cannot be reached. As a matter of fact, either conclusion might be reached, and I might agree more with the majority in this case. However, that is not my role on appellate review, for there is sufficient evidence to support the findings and conclusions of the factfinder, and the appellate judge should not substitute his opinion of the evidence for that of the trial judge. *Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 758, 96 S.Ct. 2337, 2350, 49 L.Ed. 179 (1976). The question of confusion as to the bank's name is a factual matter, and the findings on that issue should not be reversed unless clearly erroneous. Fed.R. Civ.P. 52(a); *Scott v. Moore*, 640 F.2d 708 (5th Cir. 1981); *Matter of Crist*, 632 F.2d 1226 (5th Cir. 1980).

I would therefore affirm the trial judge for the reasons stated in his opinion and order dated August 15, 1978.